IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHELLEY VANCOPPENOLLE,

                Plaintiff,              Case No. 3:08 CV 2797

    -vs-

                                             MEMORANDUM OPINION

SUN PHARMACEUTICAL INDUSTRIES,
INC., *et al.*,

                Defendant.

KATZ, J.

Plaintiff Shelley VanCoppenolle brought this action against Defendant Sun Pharmaceutical Industries, Inc. ("Sun"), and against several of Sun's employees. Plaintiff alleges wrongful discharge in violation of Ohio public policy, violation of the Ohio whistleblower statute, breach of contract, and promissory estoppel. Defendants now move for summary judgment on all claims. Plaintiff opposes, and has filed a cross-motion for summary judgment on her FMLA claims. Plaintiff also moves to strike an affidavit offered by Defendants.

For the reasons stated herein, Defendants' motion for summary judgment is granted in part and denied in part, Plaintiff's motion for summary judgment is denied, and Plaintiff's motion to strike is denied as moot.

**I. Background**

Sun is a small pharmaceutical manufacturing firm with a facility located in Bryan, Ohio. Plaintiff was hired in March 2006 as a Chemist I to work in the Quality Control department of the Bryan, Ohio facility. Plaintiff's duties included testing and reporting analytical results for Sun's products, peer review of documents, writing standard operating procedures, and maintaining the lab. Plaintiff's direct supervisor was Defendant Donna Anthony, and the Quality Control ("QC")

Manager was Defendant Shellie Dales. Additionally, Defendant Barb Regan was later hired as QC Manager in February 2008.

In January 2007, Plaintiff became the sole reviewer of the laboratory documentation of her fellow chemists and lab technicians. In this capacity, Plaintiff reviewed the documentation for procedural compliance and accuracy, flagging any corrections that needed to be completed by the original analyst.

In the latter part of 2007, Defendants claim Plaintiff's work attendance became problematic, and also claim Plaintiff experienced a number of personality conflicts with other employees. These events led to a February 7, 2008 warning and formal counseling write-up, which informed Plaintiff that she would experience more serious discipline unless her attendance and job performance improved. According to Defendants, one of Plaintiff's supervisors discovered Plaintiff violating lab document protocols after the write-up.

Also in February 2008, in preparation for a FDA site visit and a Good Manufacturing Practice ("GMP") audit, Shellie Dales instructed Plaintiff to review Batch Production and Control worksheets for compliance with internal specifications and U.S. Pharmacopeia criteria. Soon after beginning this assignment, however, Plaintiff approached the newly hired QC Manager, Barb Regan (Regan had only been hired within the last few days). Plaintiff informed Regan that she was being told to "back date" certain documents that would be reviewed by the FDA. According to Plaintiff, the documents that needing correction by the original analysts were becoming backlogged, so Dales simply told Plaintiff to make the changes herself and then to back date the documents so that they would appear to be pre-approved. Plaitniff therefore informed Regan of these allegations, and Regan began an investigation of the matter.

Plaintiff continued to be uncomfortable with what she was being asked to do, and allegedly feared that it was criminal. Plaintiff therefore telephoned a family friend (Charles Jameson) who was an attorney. Plaintiff alleges that, as a result of the phone call, she believed that back dating was a felony, though Jameson testified at deposition that he did not tell Plaintiff one way or the other that back dating was illegal–he only said, "Don't do anything illegal."[1] In any event, Plaintiff subsequently told her supervisor, Donna Anthony, that she had consulted an attorney and would no longer do what she was being asked to do. Plaintiff claims that Dales and Anthony nevertheless ordered her to continue the assignment.

Plaintiff claims that the orders to back date documents were causing her severe emotional distress, a problem for which she consulted Dr. Dennis Shelle. As a result, Plaintiff applied for FMLA leave on February 22, citing stress resulting from being ordered to back date documents. The leave was granted, and Plaintiff's last day of work was February 22.

During Plaintiff's leave, Regan continued her investigation into Plaintiff's allegations. Additionally, the Plant Manager, Defendant Jane Galliers, and the Human Resources Manager, Defendant Barb Garver, also initiated investigations. During the course of the investigations, Regan discovered deficiencies in Plaintiff's review of lab documents. According to Regan, the deficiencies were so pervasive and required so much retesting that Regan no longer wanted Plaintiff performing those functions.

Plaintiff returned from FMLA leave on March 24, 2008. The parties do not dispute that upon Plaintiff's return, Regan gave Plaintiff "revised job responsibilities." Def's. Mo. at 4. The

---

[1] This Court previously determined that Plaintiff's conversation with the attorney is not protected by the attorney client privilege. Doc. 74.

parties do dispute, however, the nature and extent of the change. In any event, Plaintiff felt she was being retaliated against so she drafted a resignation letter. She showed the letter to interim manager Bill Kazmier on March 25. According to Plaintiff, Kazmier urged her to stay, which she did.

On March 26, Plaintiff again met with Galliers and Garver to complain she was still being forced to back date documents. On March 27, Plaintiff gave Galliers a written whistleblower report stating that Shellie Dales ordered Plaintiff to modify and back date QC analysts' worksheets. On April 1, however, Gaillers and Garver's investigations concluded that Plaintiff's claims could not be substantiated.

In the days that followed, Defendants claim Plaintiff became increasingly disruptive such that by April 10, Gaillers and Garver began drafting a severance agreement for Plaintiff because they concluded Palintiff should leave the company. Five days later, on April 15, Plaintiff met with Dales and Anthony for her annual review. The meeting was contentious and, at Plaintiff's insistence, ultimately adjourned until Gaillers and Garver could join. When the meeting reconvened, Galliers terminated Plaintiff effective that day, citing continued performance and attendance problems, as well as refusal to take instruction.

Plaintiff subsequently filed the instant action for FMLA violations, violation of the Ohio Whistleblower Act, breach of contract, promissory estoppel, and wrongful termination in violation of public policy. Defendants now move for summary judgment on all claims. Plaintiff opposes, and has filed a cross-motion for summary judgment on her FMLA claims. Plaintiff also moves to strike the affidavit of Defendant Galliers.[2]

---

[2] Plaintiff also sued for intentional infliction of emotional distress and wrongful discharge in

**II. Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at

---

violation of public policy protecting whistleblower claims. Plaintiff voluntarily dismissed both of those claims. Doc. 101.

2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

**A.  FMLA**

Plaintiff asserts claims for violation of the FMLA, 29 U.S.C. § 2601, under both an interference theory and a retaliation theory.

To prevail under an interference theory, Plaintiff must establish that: "(1) she was an eligible employee; (2) Sun is a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave Defendants notice of her intent to take leave; and (5) Defendants denied her FMLA benefits or interfered with FMLA rights to which she was entitled. *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004). The only element in contention is the fifth element; namely, whether Defendants interfered with Plaintiff's right to return to an equivalent position at the conclusion of Plaintiff's leave.

As explained by the Sixth Circuit:

An eligible employee who takes leave pursuant to the FMLA "shall be entitled, on return from such leave, to be restored by the employer to the position of employment held by the employee when the leave commenced," *id*. § 2614(a)(1)(A), or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id*. § 2614(a)(1)(B). To qualify as an "equivalent position" under the FMLA, the employee's new position must be "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a).

*Lafata v. Church of Christ Home for the Aged*, No. 07-2314, 2009 U.S. App. LEXIS 10825, at **7-**8 (6th Cir. May 20, 2009).

Plaintiff contends she was returned to a vastly different position after her FMLA leave. Conversely, while Defendants concede that Regan gave Plaintiff a revised job description, they maintain the position was "equivalent" to her old job for purposes of the FMLA. Defendants specifically contend that Plaintiff's pay, benefits, job title and hours did not change upon her return. They also claim that her job duties were still those usually expected of a chemist. Yet,

Plaintiff testified that her hours were vastly different upon her return. She further testified that Defendants removed her from the position of sole reviewer, took away her lab rights and her duties as a laboratory chemist, assigned her to IT functions, took away her computer, and instructed her to wash dishes. Further, Plaintiff contends she was forbidden from speaking to either Anthony or Regan unless both were present. Thus, there remain significant factual disputes as to whether Plaintiff was returned to an equivalent position.

Defendants' argument that Plaintiff's job duties were changed at her own request is insufficient to defeat summary judgment, as facts remain disputed regarding whether and to what extent Plaintiff requested any changes. Likewise, Defendants' assertion that Plaintiff's altered job description was justified for performance reasons remains a question of fact. Further, Defendants unpersuasively argue that Plaintiff cannot prove damages because she remained employed with the same wages. To the contrary, Plaintiff correctly points out that the FMLA provides for equitable remedies, including reinstatement. In summary, factual disputes remain such that both parties' summary judgment motions must be denied as to Plaintiff's FMLA interference claim.

Regarding Plaintiff's retaliation-based FMLA claim, Plaintiff's summary judgment motion is denied and Defendants' motion is granted. To succeed on a retaliation claim, Plaintiff must demonstrate that the exercise of her FMLA rights was a motivating factor in Defendants' adverse employment decision. *Hunter v. Valley View Local Schs.*, 579 F.3d 688, 693 (6th Cir. 2009) (citing *Heady v. U.S. Enrichment Corp.*, No. 04-5762, 146 F. App'x 766, 769-70 (6th Cir. Aug. 16, 2005)). Here, Defendants argue that Plaintiff effectively conceded at deposition that Defendants were not so motivated:

    Q:    Why do you think you were let go by the company?

8

>                . . . .
>
> A:   I was raised with certain beliefs and if something was wrong, I did not want to do it. And because I wouldn't do those things [(back date documents)], I believe that's what led to my termination.
> Q:   Do you believe there's any other reasons that led to your termination?
> A:   I believe that Donna [Anthony] felt insecure about me being there.
>
>                . . . .
>
> Q:   Is there any other reasons [sic] you believe you were let go?
> A:   Not that I can think of at the time.

Plf's. June 18, 2010 Dep., Doc. 70-2 at 199:19-20; 200:19-201:2; 201:19-21 (hereinafter, "Plf's. 6/18 Dep."). Thus, as pointed out by Defendants, Plaintiff–though directly asked–did not assert that her decision to take FMLA leave led to her termination. Plaintiff's briefs do not challenge this interpretation of the deposition. Accordingly, Plaintiff's summary judgment motion is denied, and Defendants' summary judgment motion is granted as to the retaliation-based FMLA claim.

**B. Ohio Whistleblower Statute**

Plaintiff claims Defendants discharged her in violation of the Ohio whistleblower statute. OHIO REV. CODE ANN. § 4113.52. The whistleblower statute prohibits employers from taking retaliatory or disciplinary action against an employee when the employee reports violations of statutes or ordinances that he or she reasonably believes constitute a felony, or constitute a criminal offense likely to cause an imminent risk of physical harm or a hazard to public health or safety. *Id*; *Brooks v. Martin Marietta Util. Svcs., Inc.*, No. 97-4068, 1998 U.S. App. LEXIS 25824, at *10-*12 (6th Cir. Oct. 8, 1998). Importantly, employees are only protected by the whistleblower statute if they strictly comply with its dictates, *Contreras v. Ferro Corp.*, 652 N.E.2d 940, 946 (Ohio 1995), which include processes and time lines for reporting alleged violations, § 4113.52(A), as well as a requirement to make a good faith effort to determine the

accuracy of any information reported.  § 4113.52(C); *see also Fox v. City of Bowling Green*, 668 N.E.2d 898, 902 (6th Cir. 1996) (employee must investigate accuracy of supposed violation, its criminality, and its risk to public health or safety).[3]

Plaintiff's briefs claim she believed the alleged back dating constituted a felony likely to cause a hazard to the public health.  The Court finds, however, that any belief as to a felony would be unreasonable in light of the undisputed facts.  Specifically, Plaintiff claims she concluded that back dating is a felony after her consultation with Charles Jameson, an attorney.  Yet, Jameson testified that he did not tell Plaintiff one way or the other whether back dating is a crime, let alone that it is a felony.  He simply told her, "Don't do anything illegal."

Nevertheless, there is still a factual dispute as to whether Plaintiff reasonably believed the alleged back dating constituted a criminal offense likely to cause a hazard to the public health. *See Brooks*, 1998 U.S. App. LEXIS 25824, at *12 (reasonable belief as to criminal offense likely to cause hazard to public health maintains whistleblower claim).  Notwithstanding her consultation with Jameson, Plaintiff testified that her training with the Food, Drug and Cosmetic Act, as well as her knowledge of federal regulations that give rise to Good Manufacturing

---

[3]

The Court notes that the parties expend considerable effort arguing whether a crime actually did, or could have, occurred as a result of the alleged back dating.   Not only did this argument carry through a sur-reply brief filed by Plaintiff, but it also gave rise to a motion to strike–and related filings–regarding an expert's opinion on the actual legal compliance of back dating.  As explained above, however, the relevant inquiry is whether Plaintiff *believed* a crime was committed, and whether such a belief was reasonable.  The actual commission of a crime–or the potential for such crime–may be relevant to the extent it influenced Plaintiff's belief, but, as explained, *infra*, there is a factual dispute on this issue.

Plaintiff's motion to strike will therefore be denied as moot.  Given that Defendants offer no evidence to show that the expert report influenced Plaintiff's beliefs, and in consideration of all of the other evidence, the expert report is insufficient as a matter of law to negate a factual dispute as to Plaintiff's beliefs.

Practices ("GMPs"), led her to conclude that back dating amounts to "falsification" of forms submitted to the FDA. Moreover, Plaintiff purportedly believed that such falsification was criminal because "you are lying to a Federal agency that has regulations put in place to protect the public health." Plf's. 6/18 Dep. at 194:22-195:1. Further, Plaintiff testified that "[i]f [the FDA] approve[s] something based on adulterated drugs, that's putting the health–the public health at risk." *Id*. at 195:1-3. Thus, there is a factual dispute as to whether Plaintiff's beliefs were reasonable to maintain a claim. Similarly, there is a factual dispute as to whether Plaintiff's consultations with Jameson and with Defendants sufficiently satisfied the statute's investigation requirement, and whether those consultations justified a continued belief that back dating was a crime that endangered the public health.

The Court's analysis is not altered by Defendants' focus on the fact that the FDA already had the original, un-back dated documents in its possession, and that the FDA's upcoming audit would uncover the alleged back dating. Nor is the Court's analysis altered by the assertion–which is disputed by Plaintiff–that the forms in question only dealt with experimental drugs that would not be distributed to the public. Such information is only relevant to the extent it influenced Plaintiff's belief that back dating was a crime that endangered the public health. Defendants offer no such evidence. Further, Defendants are incorrect when they argue that Plaintiff's affidavit conflicts with her prior deposition and her complaint. Defendants claim there is a conflict because the affidavit is the first document to mention a felony, while the prior deposition and the complaint simply claim a belief that backdating was a crime, without mention of a felony. To the contrary, Plaintiff's assertion that back dating was a crime does not preclude a later assertion that back dating is a serious crime; i.e., a felony. In any event, this point is moot as the Court has

11

concluded that Plaintiff cannot demonstrate that she reasonably believed the alleged back dating constituted a felony.

In sum, there is a factual dispute as to whether Plaintiff reasonably believed that the alleged back dating was a crime that endangered the public health, and whether she conducted a sufficient investigation under the whistleblower statute. Accordingly, Defendants' motion for summary judgment is denied on Plaintiff's whistleblower claim.

## C. Ohio Public Policy Claim

Wrongful discharge in violation of public policy is a narrow exception to Ohio's at-will employment doctrine. *Painter v. Graley*, 639 N.E.2d 51, 55 (Ohio 1994) (quoting *Phung v. Waste Mgt., Inc.*, 491 N.E.2d 1114, 1116 (Ohio 1986)); *see also Greeley v. Miami Valley Maint. Contractors*, 551 N.E.2d 981 (Ohio 199) (establishing public policy cause of action). To state a claim for wrongful discharge in violation of public policy,

> a plaintiff must plausibly allege that: (1) a clear public policy existed, manifested in a state or federal constitution, statute or administrative regulation (clarity element); (2) dismissing employees under such circumstances would jeopardize the public policy (jeopardy element); (3) conduct related to the public policy motivated the dismissal (causation element); and (4) the employer lacked an overriding business justification (justification element).

*Unger v. City of Mentor*, 387 Fed.Appx. 589, 593-94 (6th Cir. 2010) (citing *Kulch v. Structural Fibers, Inc.,* 677 N.E.2d 308, 321 (Ohio 1997)). Here, Plaintiff cannot satisfy the clarity element or the jeopardy element.

Regarding the clarity element, Plaintiff twice specifies that the policy on which she relies is a common law policy based on an employee's right to "refuse to participate in activities that arguably violate criminal statutes." Pl's. Opp. at 21, 23. Even if case law supports the proposition that there is a common law policy protecting refusal to *actually* violate criminal statutes–an issue

12

on which the Court does not express an opinion–Plaintiff points to no case law demonstrating a public policy encompassing situations where a criminal violation is "arguable."

Even if Plaintiff satisfied the clarity element, Plaintiff cannot satisfy the jeopardy element. In *Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36 (Ohio 2007), the Ohio Supreme Court explained that "we [previously] noted that '[a]n analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim. . . . Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.'" *Id*. at 42 (quoting *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, ¶15 (Ohio 2002)). The Sixth Circuit subsequently interpreted *Leininger* to mean that the jeopardy element is not satisfied unless the plaintiff demonstrates that "no alternative remedy exists." *See Tracy v. Northrop Grumman Sys. Corp.*, No. 10-3930, 2011 U.S. App. LEXIS 26123, at *2 (6th Cir. Dec. 20, 2011) ("The district court correctly held that . . . the Ohio common law on fraud was not an appropriate public policy source because Tracy had available to her statutory remedies under the state and federal whistleblower statutes.").

The Court is not persuaded by Plaintiff's attempt to avoid this application of *Leininger* by characterizing her claim as involving a "multiple-source" public policy. *See Leininger*, 875 N.E2d at 41 (quoting *Collins v. Rizkana*, 652 N.E.2d 653 (Ohio 1995)) (public policy that arises from more than one source–i.e., a "multiple-source" public policy–may implicate different analysis ). Here, common law is the only source from which Plaintiff's putative policy derives. Plaintiff does point to several provisions of the Food, Drug and Cosmetic Act, but those provisions do not articulate a right to refuse to violate the law, they simply constitute the laws that would be

13

violated. Thus, Plaintiff is unable to satisfy the clarity and jeopardy elements, and the Court must enter summary judgment against her public policy claim.

**D. Breach of Contract and Promissory Estoppel**

Ohio recognizes implied contract and promissory estoppel as exceptions to the at-will employment doctrine. *Tersigni v. Gen. Tire, Inc.*, 633 N.E.2d 1140, 1141 (Ohio Ct. App. 1993) (citing *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150 (Ohio 1985)). In the instant matter, Plaintiff argues that language in Sun's Code of Ethics and Business Policy (hereinafter, "Policy"), invokes implied employment contract and promissory estoppel doctrines such that Sun is prohibited from terminating Plaintiff for reporting rules violations. Specifically, Plaintiff cites language in the Policy that states:

> Each employee is responsible for reporting, in good faith, any circumstances believed to constitute a violation of code, as well as any other company policies. Suspected violations should be directed to the department head or the department manager, or alternatively, anonymously submitted in writing. There will be no retribution against any employee for good faith reporting on suspected violations, however, protection from possible disciplinary action will not be provided for any reporting in bad faith or otherwise engaging in misconduct.

Pl's. Opp. at 30.

Defendants counter that the Policy includes disclaimers that negate the possibility of an implied contract and prevent employees from relying on the promises for purposes of promissory estoppel:

> This document is not an employment contract between [Sun] and any of its employees, officers, or directors and does not alter [Sun's] at-will employment policy.

Def's. Mo. at 16. Defendants also point to another section of the Policy, which states:

> Nothing in this Corporate Policy Manual is intended to constitute or should be regarded as constituting any contract of long term employment or promise thereof, nor should any policy herein affect the at will nature of employment with [Sun].

14

*Id.*

Regarding implied contract, the Ohio Supreme Court has held that, absent fraud in the inducement, the terms in an employee handbook do not constitute an employment contract when the handbook contains an at-will disclaimer. *Wing v. Anchor Media, Ltd.*, 570 N.E.2d 1095, 1098 (Ohio 1991). Plaintiff argues that "since it is Defendants' position that it had no intention of honoring its express promise of job security to those who report violations in good faith, that is clear evidence of fraud in the inducement." Pl's. Opp. at 30. This conclusory assertion does not demonstrate fraud in the inducement, and the terms of the Policy therefore cannot constitute an implied contract per *Wing*.

To establish a claim for promissory estoppel, Plaintiff must prove that "(1) the defendant made a clear, unambiguous promise; (2) the defendant should have reasonably expected the promise to induce action or forbearance on the part of the plaintiff; (3) the promise actually induced action or forbearance that was detrimental to the plaintiff; and (4) enforcement of the promise is necessary to avoid injustice." *Woodworth v. Concord Mgmt. Ltd.*, 164 F. Supp. 2d 978, 987 (S.D. Ohio 2000). Here, Plaintiff's promissory estoppel claim fails because there could be no reasonable reliance in light of the Policy's disclaimer, which explicitly states in two separate places that nothing in the Policy alters an employee's at will employment status. Plaintiff's reliance on the statements of Gaillers and non-party supervisor Bill Kazmeier does not change the analysis. Plaintiff's supposition that Gaillers "apparently" understood the Policy as altering an employee's at will status is inapposite. The portion of the Gaillers deposition to which Plaintiff cites shows that Galliers was merely acknowledging the Policy's statement that there will be no retribution for reporting violations. Moreover, Kazmeier's assurances to Plaintiff that she was

15

protected by Sun's Policy came after Plaintiff had reported the violations and consulted an attorney. Thus, Plaintiff could not reasonably have relied on these assurances when reporting.

In sum, Plaintiff can neither establish a claim for breach of an implied employment contract, nor a claim for promissory estoppel. Accordingly, summary judgment is entered in favor of Defendants on these claims.

## IV. Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is granted in part and denied in part. (Doc. 82). Summary judgment is entered against Plaintiff's claims for breach of contract, promissory estoppel, and wrongful discharge in violation of Ohio public policy. Summary judgment is denied as to Plaintiff's FMLA and Ohio Whistleblower claims.

Plaintiff's motion for summary judgment is denied (Doc. 103), and Plaintiff's motion to strike is denied as moot. (Doc. 114).

IT IS SO ORDERED.

                                              s/ *David A. Katz*
                                              DAVID A. KATZ
                                              U. S. DISTRICT JUDGE